## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHAEL JONES, # 420-162     *
    *
    *
v     *     Civil Action No. CCB-15-3137
    *
SERGEANT JANET PUFFENBARGER,     *
SERGEANT BALANSKI,     *
CORRECTIONAL OFFICER D.W.     *
  ROUNDS, SR.     *
CORRECTIONAL OFFICER D.W.     *
  ROUNDS, JR.     *
CORRECTIONAL OFFICER CODY GILPIN, *
CORRECTIONAL OFFICER T.B.     *
  MARCHINKE,     *
    *
    ***

## MEMORANDUM

Pending is Michael Jones's[1] complaint (Compl., ECF No. 1; Suppl. Compl., ECF No. 4) and defendants' unopposed motion to dismiss or for summary judgment. (Defs.' Mot. to Dismiss, ECF No. 16.)[2]  Having considered the pleadings and supporting documents, the court finds a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated below, the court will grant defendants' motion.

## BACKGROUND

### A.  Jones's Claims

Michael Jones is incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland.  (Compl. ¶ 11.)  She was transferred to the Maryland Department of Public Safety and Correctional Services ("DPSCS") from Ohio.  (Decl. of Sharon Baucom ¶ 7, ECF No. 16-7.)  All defendants are corrections officers at NBCI.

---

[1] Jones identifies as a transgender inmate (Compl. ¶ 11) therefore feminine pronouns will be used when referring to her.
[2] Consistent with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), the Clerk sent notice to Jones informing her of her right to file a response to defendants' dispositive motion and to file affidavits and exhibits in support. (Rule 12/56 Ltr. to Michael Jones, ECF No. 18.)  Jones did not file anything further.

In her complaint filed on October 15, 2015, and supplemented on November 9, 2015, Jones, who identifies himself as a transgender woman,[3] raises claims of sexual assault, unconstitutional conditions of confinement, excessive force, failure to protect, denial of medical care, gender discrimination and verbal threats.  (Compl. ¶¶ 18–22; Suppl. Compl. ¶¶ 23–31.) Jones supplemented her complaint with a declaration.  (Decl. of Michael Jones, ECF No. 4-2.)

Jones alleges that on September 28, 2015, she reported to Ms. Wilson Moulden, a member of the NBCI mental health staff, that she had been sexually assaulted four times in the past 18 months. (Compl. ¶ 12.)  Moulden left the room to report Jones's allegations. (*Id.*)  Sgt. Puffenbarger entered the room and asked her to write a statement.  (*Id.* at ¶ 13.)  Puffenbarger allegedly stated, "You dumb n**** bitch I am now going to tell these 3 guys you wrote statements against them and seeing two of them are Bloods you should be raped again and murder[ed] in no time." (*Id.*)  Sgt. Bielanski[4] entered the room and told Jones to sign a paper and allegedly said, "You know I can protect you and all [you] got to do is give me some of that Black pussy . . . ." (*Id.* at ¶ 14.)  Jones alleges that when she refused, Bielanski replied, "That's ok, cause when we are done with you, you will be glad to suck are [sic] white cocks." (*Id.*)  A few minutes later, Puffenbarger and Officer Marchinke escorted Jones to a strip cage.  (*Id.* at ¶ 15.) Puffenbarger allegedly stated, "Now n**** your [sic] going on watch." (*Id.*)  Jones states she was placed in a cold cell wearing only a suicide smock.  (*Id.*)  Jones states "on Tuesday" she was seen by Ms. Beitzel, who is a member of the mental health staff, and taken off suicide watch. (*Id.*)

---

[3] Jones's claim that she received constitutionally inadequate medical treatment for gender dysphoria were considered in *Jones v. Director John Does, et al.*, Civil Action No. GLR-15-3065 (D. Md.).  On May 26, 2016, the Honorable George L. Russell, III, granted summary judgment in favor of defendants in that case.
[4] Jones spells the officer's last name "Balanskie."

Jones alleges on "Wednesday" [5] Officer D. Rounds, Jr. ("Rounds, Jr.") took her to a hallway where there were no cameras and sexually assaulted and raped her. (*Id*. at ¶ 16.) Jones alleges unnamed "correctional officers started to join in." (*Id*.) Jones alleges Puffenbarger and Bielanski stood by and watched. (*Id*.) Afterwards, Jones was placed in a cold cell in her jumpsuit without sheets or blankets. (*Id*.)

Jones asserts that she was assaulted by Marchinke and Rounds, Jr., on October 12.[6] (Suppl. Compl. ¶ 3.) Jones claims the officers "lie[d]" by stating that she had expressed suicidal thoughts. (*Id*.) Puffenbarger handcuffed her so tightly that "they were really trying to break my wrist." (*Id*.)

Jones alleges that on October 20, 2015, Rounds, Marchinke and Fann[7] placed her in her cell after her appointment with a mental health provider. (*Id.* at ¶ 5.) They pulled her hands out from the cuff port door to try to break her wrist, and asked "How does it feel n*****, one day I will bash you[r] head in n***** . . . ." (*Id*.)

Jones alleges that on October 27, 2015, she witnessed Puffenbarger instruct Officer Durst and "John Doe" to assault another inmate. (*Id*. at ¶ 6.) Puffenbarger and Lt. Wilt noticed Jones watching, and they told her that she was next. (*Id*.) Durst and an officer identified as "John Doe" went to Jones's cell and told her to cuff up. (*Id*. at ¶ 7.) They took Jones to cell #30 where they kicked her legs and pulled her handcuffs in an attempt to break her wrists. (*Id*.) Jones asked for medical treatment and was denied. (*Id*. at ¶ 8.) Jones asked why she was in the disciplinary cell, and Officer Rounds Sr. stated "That's what happens to n****** who don't know how to mind their business." (*Id*.)

---

[5] Defendants and the court infer that the date was September 30, 2015. Jones alleged she told Moulden on Monday, September 28, 2015, that she had been sexually assaulted. (Defs.' Mem. in Support of Mot. to Dismiss 2, n. 1, ECF No. 16-1.)

[6] Jones does not specify what year this occurred, and the court will assume the date is October 12, 2015.

[7] Jones did not name Fann as a defendant.

Jones alleges Laura Beitzel, a mental health provider, came to her cell, and Jones agreed to be handcuffed.  (*Id*. at ¶ 11.)  Jones was taken to a strip cell.  (*Id*.)  Rounds, Jr., strip searched Jones and asked her to cuff-up.  (*Id*. at ¶ 12.)  When Jones asked for her clothing, Rounds allegedly stated, "No, I told you that Lieutenant Bradley Wilt wanted to see that pretty black pussy while you walk up and down the hall naked."  (*Id*.)  Jones refused to cuff-up.  (*Id*. at ¶ 13.)  Rounds, Jr., told Jones that she had better "cuff [her] n***** ass up before we beat your n***** ass and rape you again."  (*Id*.)  Jones complied and was walked naked through the hall to cell #30.  (*Id*.)  She was given a suicide smock to wear and stayed there for six days without a mattress or toilet paper.  (*Id*. at ¶ 14.)  Jones avers that she was not on suicide watch.  (*Id*.)

Jones seeks preliminary and injunctive relief ordering that she be placed on protective custody status and transferred out of NCBI.  (Compl. ¶ 24.)  She wants the court to order the rape and sexual harassment to stop.  (*Id*.)  She also wants her sheets and blankets returned.  (*Id*.)  Jones requests compensatory damages of $25,000, (*id.* at ¶ 25), and punitive damages of $50,000 against each defendant.  (*Id.* at ¶ 26.)

### B.  Defendants' Response

Defendants aver that Jones has been trying to get transferred back to Ohio since March 14, 2014, when she told an investigator at Western Correctional Institution that she was unhappy in Maryland.  (Case Mgmt. Assignment Sheet 3, ECF No. 16-3.)  She said she would resort to violence if peaceful means did not work.  (*Id*.)  On April 10, 2014, Jones scraped her wrist on the feed-up slot because she wanted to be moved to NBCI or the federal system.  (Staff Alert Removal/Review 2, ECF No. 16-4.)  She is housed in a single cell for behavioral reasons and will remain in this status until it is determined she can be safely celled with another inmate. (Decl. of Scott Beeman ¶¶ 4–5, ECF No. 16-6.)

Defendants explain that once an inmate is placed on suicide precautions, a psychology staff member follows up within twenty-four hours, or in the case of a weekend, the next business day.  (Decl. of Bruce Liller ¶ 5, ECF No. 16-8.)  Liller states that since Jones's arrival at NBCI on April 11, 2014, she has been placed on suicide precautions four times, and "[i]n each incident it was for secondary gain."  (*Id*.)

Jones has a primary diagnosis of antisocial personality disorder with "multiple disruptive/manipulative behaviors." (Decl. of Sharon Baucom ¶ 14a, ECF No. 16-7).  Jones has swallowed 2 AA batteries and threatened to swallow more batteries if she is not transferred back to Ohio.  (*Id*.)  She has smeared feces multiple times, spit at staff, engaged in self-mutilating behavior, and threatened hunger strikes.  (*Id*.)  Jones has admitted to using suicide ideation and gestures for secondary gain. (*Id*.)  She is routinely followed by mental health providers. (*Id*. at ¶ 11.)

On Monday, September 28, 2015, Laura Wilson[8], a psychology associate, met with Jones to discuss her placement on administrative segregation status.  (Decl. of Nicole Beuchert 14, ECF No. 16-9.)  Jones bragged about her history of violence and "doing whatever it takes" to get what she wants. (*Id*. at pp. 14, 96.)  Jones told Wilson that she had been sexually assaulted "many times and admitted it ha[d] happened since she had been at NBCI." (*Id*. at p. 96.) Wilson informed Lieutenant Wilt that Jones reported being raped.  (*Id*. at pp. 11, 90.)  Wilt obtained Jones's written statement in which Jones stated she was raped in November of 2014 by inmate Riddle; on July 1, 2015, by an inmate known as "Loon;" and on June 1, 2015, by inmate Joyce. (*Id*. at pp. 11, 90, 91.)  Based on Jones's allegations, Wilt wrote a Serious Incident Report and contacted the Internal Investigative Division ("IID").  (*Id.* at pp. 3, 10, 15, 86–92.)  Detective Scott Peterson was assigned to investigate.  (*Id*.)

---

[8] Jones refers to Wilson as Ms. Wilson Moulden.  (Compl. ¶ 13.)

Also on September 28, 2015, Jones claimed that she was suicidal. (*Id.* at p. 90.)  She told Puffenbarger, "I am going on suicide watch bitch fuck you and this place I will sue all of you for all your money." (Info. R. Form, ECF No. 16-10.)  Puffenbarger's attempts to calm Jones proved unsuccessful and mental health providers were notified. (*Id.*)  Jones was strip searched, given a security smock and moved to a holding cell for observation.  (*Id.*)  A spit mask was placed on Jones to avoid any assaults on staff due to her heightened agitation.  (*Id.*)  Jones smeared feces on the inside of the cell door and floor, urinated on the floor, and attempted to push feces under the cell door into the hall.  (Admin. Action Report 8, ECF No. 16-11.)  Jones refused to comply with Puffenberger's order to clean up the mess. (*Id.*)

On September 29, 2015, Puffenbarger wrote a notice of inmate rule violation charging Jones with violating Rules 100, involvement in a disruptive activity, 116, misuse or destruction of property, 400, disobeying a direct order, and 408, misuse, alteration, or destruction of property. (*Id.*)  On October 1, 2015, a hearing officer found Jones guilty of violating all four rules and imposed 225 days of segregation for the violations of Rules 100 and 116, to be served concurrently.  (*Id.* at pp. 12–14.)  Jones appealed, and the sanction was reduced to 125 days of segregation.  (*Id.* at pp. 1–6.)

On Wednesday, September 30, 2015, Jones refused to be seen by Janette Clark, a nurse practitioner, concerning the reported sexual assaults and signed a release of responsibility ("ROR") form. (Decl. of Nicole Beuchert 14; Decl. of Janice Gilmore ¶ 7, ECF No. 16-12.)  Beitzel saw Jones for suicide monitoring follow-up. (Michael Jones Med. Records 9, ECF No. 16-3.) Beitzel's notes from the visit report that Jones's speech was mumbled because she was wearing a spit mask, but Jones stated that she was fine.  (*Id.*)

On October 1, 2015, Jones agreed to PREA[9] sexually transmitted disease testing. (Decl. of Britt Brengle 70, ECF No. 16-22.)

On October 6, 2015, IID Investigator Peterson interviewed Jones about the rape allegations. (Decl. of Nicole Beuchert 11.) Jones stated she was assaulted in October 2014 by Riddle and in June 2015 by "Loon" while assigned to cell 1-A-64. (*Id.* at p. 12.) Jones did not want to pursue criminal charges, but wanted to return to Ohio or be placed on protective custody. (*Id.*)

From October 8, 2015, to October 14, 2015, Jones was out of NBCI for a medical trip. (Record of Segregation Confinement 8, 10, 12, ECF No. 16-14; Michael Jones Med. Records 22–25.)

On October 20, 2015, Jones refused to close the cell door feed slot because she did not receive two servings of a food item. (R. of Segregation Confinement 10.) The same day, she was seen by a case manager for PREA screening. (PREA Intake Screening, ECF 16-15.) Officer Marchinke was out on personal leave that day. (Decl. of John White ¶ 8, ECF No. 16-21.)

Also on October 20, 2015, the Inmate Affairs Department received a letter written by Jones which was stamped as mailed from WCI on October 5, 2015. (Decl. of Kristina Donnelly 4, ECF No. 16-16.) Jones alleged in the letter that she was sexually assaulted by Rounds, Jr., and also assaulted by Puffenbarger, Bielanski, Rounds, Sr., Gilpin, W. Mallow,[10] and Marchinke. (*Id.* at 3.) Jones alleged she was deprived of blankets, sheets, toilet paper and her property for eight days and was on a hunger strike. (*Id.*) Acting Commissioner Randall Watson responded by letter dated November 6, 2015. (*Id.* at 6.) Watson informed Jones that her allegations of sexual

---

[9] Prison Rape Elimination Act, 42 U.S.C. §15601, *et seq.*
[10] Jones did not name Mallow as a defendant in this case.

assault were under investigation in case #IID 15-35-07363. (*Id.*) Watson noted that Jones was on a hunger strike from October 25, 2015, to October 27, 2015, because she wanted a transfer. (*Id.*) Watson indicated that Jones had told correctional staff that another inmate was transferred after acting out and going on hunger strike, and that she intended to follow suit. (*Id.*) Watson informed Jones that manipulation or making false accusations would not prompt her transfer to Ohio. (*Id.*) Watson told Jones that a review of her property inventory showed that she possessed all property allowed for disciplinary segregation inmates. (*Id.*) The letter also noted that Jones had destroyed state property and possessed two metal bolts, but the matter was resolved without the use of force. (*Id.*)

On October 27, 2015, Rounds, Jr., observed that Jones's cell window was covered and ordered Jones to uncover it. (Inmate Hearing R. 9, ECF No. 16-18.) Jones refused and told Rounds, Jr. to "get the fuck away from my door." (*Id.*) Rounds, Jr., could hear a scratching noise on the cell window. (*Id.*) Jones said "I got the sink apart and I'm going to tear this cell up." (*Id.*) After attempts to convince Jones to uncover the window were unsuccessful, a use of force was authorized. (*Id.*) Before force was used, however, Jones complied and was handcuffed. (*Id.*; Daily Events Log for Oct. 27, 2015, ECF No. 16-19; DVD of Michael Jones Escort, ECF No. 16-20;[11] Michael Jones Med. R. 17.)

Jones's cell was searched and two metal screws approximately one inch in length were found. (Inmate Hearing R. 9.) Jones had used the screws to scratch her cell window. (*Id.*) Jones was strip searched, escorted to the "Boss (Body Orifice Scanning System),"[12] and placed

---

[11] The recording captures Jones's strip search and escort. It also shows that a peaceful resolution of the matter was negotiated, and that Jones was taken to a strip cell without incident. (DVD of Michael Jones Escort.) The DVD is under seal to protect Jones's privacy. Jones has reviewed a copy of the recording filed in this case. (Decl. of John White, ECF No. 19-21.)

[12] BOSS uses a low intensity magnetic field to conduct a noninvasive search to detect small metal objects inside body cavities. (Defs.' Mem. in Support of Mot. to Dismiss 10, n. 6.) Before Jones was taken to the Boss chair, all female staff members were cleared from the area. (Decl. of Bradley Wilt ¶ 14, ECF No. 16-30.) Jones was escorted

in a cell without incident. (R. of Segregation Confinement 10; DVD of Michael Jones Escort.) Although Jones was not on suicide precautions, she was placed in a security garment upon her return to the cell to prevent her from using her jumpsuit to cover the window on the cell door. (Michael Jones Med. R.17.)  Beitzel noted that "multiple staff members have reported Jones's [sic] desire to follow in the footsteps of a prior inmate who received an ICC through exhibiting similar patterns of disruptive behavior," and that Jones would continue to be monitored.  (*Id.*) Jones was scheduled to be seen in the health clinic that day, but refused stating she was on a hunger strike.  (*Id.* at p. 18.)

Jones was issued a notice of inmate rule violation, charging her with violating Rule 116, damaging property, and Rule 400, disobeying a direct order.   (Inmate Hearing R. 9.)   On November 10, 2015, a hearing officer founded her guilty of violating both rules and sanctioned her with ninety days of segregation and ordered her to pay $143.24 in restitution.  (*Id.* at p. 7.)

On November 9, 2015, Monica Wilson, a social worker, met with Jones for PREA counseling.  (Michael Jones Med. R. 19.)  Wilson reported that during the entire conversation, Jones talked about what she wanted, including transfer to Ohio, and if she didn't get it she was going on a hunger strike.  (*Id.*)  Wilson wrote that it "seems Jones is trying to manipulate other[s]" for her own personal gain. (*Id.*)  Jones talked about "wearing everyone down so they will get rid of [her]."  (*Id.*)  Of note, Jones never mentioned the PREA incident to Wilson, and told Wilson that she smeared feces on the cell window because she was not given toilet paper. (*Id.*)

---

from BOSS to the cell without a security garment because the garment would need to be removed at the BOSS chair to conduct the body scan.  (*Id.* at ¶ 15.)  Wilt states that "escorting of an unclothed inmate is not a common occurrence, however there are occasions when the quick, safe resolution of an incident will outweigh concerns for the modesty of an inmate." (*Id.*)  Wilt explains the security garment is made of a large, stiff material which would interfere with attempts to regain physical control should an inmate initiate violence or become noncompliant during the escort.  (*Id.*)  In this case, every precaution was taken to ensure that if the incident escalated, staff would be able to regain physical control.  (*Id.*)

On December 4, 2015, following Jones's filing of the instant complaint, all pertinent parties were notified and a serious incident report and a PREA investigation were initiated. (Decl. of Britt Brengle 5–7.)  Detective Christopher Burton was assigned to investigate Jones's claims for the IID.  (*Id*.)   Jones refused to cooperate, provide a written statement, or to be interviewed by Burton.  (*Id*.)

On December 7, 2015, Dr. Mahboob Ashraf posed PREA specific questions to Jones concerning sexual or physical abuse which allegedly occurred in October 2015. (*Id*. at p. 6.) Jones denied any complaints of sexual or physical abuse, verbal abuse, bruising, or trauma. (*Id.* at pp. 6, 19, 73.)

On December 8, 2015, Alan Graves, DDS, examined Jones.  (Michael Jones Med. R. 21.) Jones told him that the PREA event had occurred in October, and had already been addressed. (*Id*.)  Graves observed no signs of trauma intraorally or extra-orally.  (*Id*.)

On January 4, 2015, IID investigator Burton interviewed Rounds, Jr., who denied having any physical contact with Jones, sexually assaulting Jones, and also denied any knowledge of an incident involving a sexual assault on Jones by corrections officers.  (Decl. of Britt Brengle 7.) As earlier noted, Jones refused to be interviewed by Burton for the IID investigation.  (*Id*. at p. 6.)

On January 11, 2016, Jones met with social worker Monica Wilson who observed that Jones talked "obsessively" about herself, but not once discussed the alleged PREA incident, past abuse of any kind, or any fear of being in prison as a transgender person.  (Michael Jones Med. R.  2.)  Jones told Wilson that she did not talk to the IID investigator because "they" work for the institution and cannot be trusted.  (*Id*.)  Jones told elaborate stories about herself and the power she has due to being a member of the Black Mafia and specialized training.  (*Id*.)

On January 8, 2016, IID investigator Burton concluded his investigation of Jones's allegation that she had been raped by Rounds, Jr. (Decl. of Britt Brengle 7.)  After reviewing all institutional reports, interviewing Rounds, and meeting with Monica Wilson concerning her counseling sessions with Jones, Burton determined the allegation was unfounded and recommended closing the IID case.  (*Id.*)

Defendants' submissions demonstrate that Rounds, Jr., did not work on September 30, 2015, as it was his day off ("regular relief day").  (Decl. of John White ¶ 6.)  Timothy Marchinke did not work on October 20, 2015.  (*Id*. at ¶ 8.)  In their declarations, Rounds Jr., Bielanski, Gilpin, Puffenbarger, Durst, Rounds, Sr., Marchinke and Wilt attest that at no time did they, or any other correctional officer in their presence, physically or sexually assault, harass, or threaten Jones.  (Decl. of Charles Bielanski ¶ 3, ECF No. 16-23; Decl. of Cody Gilpin ¶ 3, ECF No. 16-24; Decl. of Janet Puffenbarger ¶ 3, ECF No. 16-25; Decl. of Jamey Durst ¶ 3, ECF No. 16-26; Decl. of Dean Rounds, Sr., ¶ 3, ECF No. 16-27; Decl. of Dean Rounds, Jr., ¶ 3, ECF No. 16-28; Decl. of Timothy Marchinke ¶ 3, ECF No. 16-29; Decl. of Bradley Wilt ¶ 12.)   In their declarations, Rounds, Jr., Bielanski, Gilpin, Puffenbarger, Durst, Rounds, Sr., Marchinke and Wilt deny that they refused, interfered with, or delayed medical treatment for Jones. (*See, e.g.*, Decl. of Charles Bielanski ¶ 4.)

Jones has filed at least 44 Administrative Remedy Procedure ("ARP") requests at NBCI. (Michael Jones ARP Index R., ECF No. 16-31.) On December 8, 2015, Jones filed an ARP complaining that Officers J. Durst, Murray, and Marchinke refused to collect her ARP on December 4, 2015.  (NCBI-ARP-2531-15, ECF No. 16-32.)  Puffenberger investigated the ARP, and it was dismissed on December 13, 2015.  (*Id;* Michael Jones ARP Index R. 2.)[13]   On

---

[13] Jones's ARP index shows that she in fact filed an ARP on December 4, 2015, complaining of not feeling safe because she is transgender.  The ARP was assigned NBCI-2503-15.  (Michael Jones ARP Index R. 2.)

December 8, 2015, Jones filed an ARP to complain that she had turned in five ARPs concerning transgender laws, but had not been provided the yellow receipt copies. (NBCI-ARP-2530-15, ECF No. 16-33; Michael Jones ARP Index R. 3.)  The ARP was dismissed pending resubmission with the names of the officers and dates at issue by December 23, 2015. (Michael Jones ARP Index R. 3.)  Jones did not resubmit it.  (*Id.*)

Jones filed several grievances with the Inmate Grievance Office ("IGO").  (Decl. of Russell Neverdon ¶ 3, ECF No. 16-34.)  None involved allegations that defendants participated in an incident of assault, sexual assault or unconstitutional conditions of confinement.  (*Id*. at ¶¶ 4–8.)  On January 28, 2015, Jones filed a grievance with the IGO which complained of failure to process ARP requests and other matters including corruption, falsified documentation, and double celling.  (*Id*. at ¶ 6.)  On March 2, 2015, Jones was asked to provide a brief and concise statement of her claims within thirty days.  (*Id*.)  On April 5, 2015, the file was closed for failure to comply with the request, and the matter was dismissed.  (*Id*.)

## DISCUSSION

### A.  Standard Of Review

A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), or does not state "a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (*citing Twombly*, 550 U.S. at 555).  Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. *Goss v. Bank of Am., N.A.*, 917 F.Supp.2d 445, 449 (D.Md. 2013) (*quoting Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)), *aff'd sub nom.*, *Goss v. Bank of Am., NA*, 546 F.App'x 165 (4th Cir. 2013).

Pro se pleadings, however, are liberally construed and held to a less stringent standard than pleadings drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *accord Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 722 (4th Cir. 2010).  In considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing Mylan *Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

"When matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir. 1998) (*quoting* Fed. R. Civ. P. 12(b)). Under Rule 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the Court must draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

A "material fact" is one that might affect the outcome of a party's case. *Id*. at 248; *see JKC Holding Co. v. Wash. Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir. 2001) (*citing Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *accord Hooven-Lewis*, 249 F.3d at 265.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [her] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

### B. Analysis

#### 1. Eleventh Amendment Immunity

Jones is suing defendants in their official and individual capacities. (Compl. ¶ 10.) Defendants contend they are protected from suit in their official capacities under the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by

Citizens or subjects of any Foreign State."  In effect, the Eleventh Amendment bars suits for damages against a state in federal court unless the state has waived its sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). "[A] suit against a state official in his or her official capacityy is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71.

Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. State Gov't Code Ann.,  §12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Defendants were state employees during the times in question, and thus, Jones's claims for monetary damages against defendants in their official capacities are barred by the Eleventh Amendment.

### 2.  Exhaustion of Administrative Remedies

Inmates are required to exhaust "such administrative remedies as are available" before filing an action. 42 U.S.C. § 1997e(a); *see Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016) ("An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones."). This requirement is one of "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Exhaustion is mandatory. *Ross*, 136 S.Ct. at 1857; *Jones v. Bock*, 549 U.S. 199, 219 (2007).  A court may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (*citing Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")). The purpose of exhaustion is to: 1) "allow[ ] a prison to address complaints about the program it administers before being subjected to suit"; 2) "reduce[ ] litigation to the extent complaints are satisfactorily resolved"; and 3) prepare a "useful record" in the event of litigation. *Jones*, 549 U.S. at 219. An inmate's failure to exhaust administrative remedies is an affirmative defense; defendant bears the burden of proving that he had remedies available to him of which he failed to take advantage. *Jones*, 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725.

In *Ross*, the Supreme Court identified three circumstances in which an administrative remedy is unavailable. 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In Maryland, filing an ARP with the warden of the prison is the first of three steps in the ARP process. *See* Code of Md. Regs. ("COMAR"), tit. 12 §07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is

later. COMAR, tit. 12 §07.01.05A. If the request is denied, a prisoner has 30 calendar days to file

an appeal with the Commissioner of Correction. COMAR, tit. 12 § 07.01.05C. If the appeal is

denied, the prisoner has 30 days to file a grievance with the IGO. *See* Md. Corr. Servs., Code

Ann. §§ 10-206, 10-210; COMAR, tit. 12 §§ 07.01.03, 07.01.05B.

Complaints are reviewed preliminarily by the IGO. *See* Md. Corr. Servs., Code Ann. §

10-207; COMAR, tit. 12 § 07.01.06A.   An inmate may submit any grievance to the IGO

concerning an official or employee of the Division of Correction (DOC).  Md. Code Ann. Corr.

Servs. §10-206(a). An inmate may file a complaint of sexual misconduct with the IGO.  *See*

OSPS.050.0030(.05)(E)(4)(a)(v).  If a complaint is determined to be "wholly lacking in merit on

its face," the IGO may dismiss it without a hearing. Md. Corr. Servs., Code Ann. § 10-207(b)(1);

COMAR, tit. 12 § 07.01.07B. The order of dismissal constitutes the final decision of the

Secretary of the Department of Public Safety and Correctional Services (DCPCS) for purposes of

judicial review. Md. Corr. Servs., Code Ann. § 10-207(b)(2)(ii). However, if a hearing is deemed

necessary by the IGO, the hearing is conducted by an administrative law judge with the

Maryland Office of Administrative Hearings. *See* Md. Cts. & Jud. Proc., Code Ann. § 10-208(c);

COMAR tit. 12 § 07.01.07-.08. The conduct of such hearings is governed by statute. *See* Md.

Corr. Servs., Code Ann. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a

final agency determination. However, a decision concluding that the inmate's complaint is

wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must

make a final agency determination within 15 days after receipt of the proposed decision of the

administrative law judge. *See* Md. Corr. Servs., Code Ann. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies. *See* Md. Corr. Servs., Code Ann. § 10-210. An inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."). The ARP process does not apply to complaints concerning rape, sexual assault, sexual harassment, sexual abuse and sexual misconduct. OPS.185.0002.(05)(F).[14]

Defendants aver Jones has failed to appeal her claims through all three steps in the administrative remedy procedure and, in the case of her claims of sexual assault, through the IGO grievance process. Jones does not oppose defendants' dispositive motion. A claim of sexual assault is subject to the IGO grievance process. OSPS.050.0030(.05)(E)(4)(a)(v); *see generally, Moore v. Maryland DOC*, (DPSCS-IGO-002V-15-38703) (February 3, 2016), ECF No. 16-35. As there is no record that Jones presented her claims of sexual assault to the IGO, and she does not otherwise refute IGO Director Neverdon's declaration in this regard, this claim is unexhausted and subject to dismissal.

Jones claims Puffenbarger threatened her on September 28, 2015; she was subjected to unconstitutional conditions of confinement on September 28, 2015, October 20, 2015, and October 27, 2015; defendants tried to break her wrists, and threatened her on October 12, 2015, October 20, 2015, and October 27, 2015; defendants subjected her to verbal harassment; defendants denied her medical care; and defendants subjected her to racial and gender discrimination and harassment.  These claims are subject to the ARP process and there is no

---

[14]  The court notices OPS.185.0002 is an Executive Directive issued by the DPSCS, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive"). The Directive was submitted as exhibit ECF No. 16-2 in *Payton v. Bishop*, ELH-15-3648.

evidence Jones exhausted them through the ARP process. Accordingly, these claims are unexhausted.

Jones states in her complaint that she has not exhausted her administrative remedies because she would have had to turn her forms in to the same persons who allegedly sexually assaulted her, and that she filed ARPs but never received a receipt or a response. (Compl. ¶ 17; Suppl. Compl. ¶ 22.) Jones filed 44 ARPs at NBCI, which belies a claim of improper handling of her ARP requests. The court also notes that Jones filed two ARPs complaining that her ARP forms were not collected, but neither was fully presented through the ARP process.  (Michael Jones ARP Index R.; NCBI-ARP-2531-15; NBCI-ARP-2530-15.)   Jones's self-serving and summary assertion concerning the depositing of requests for administrative remedies fails to show the process was unavailable to her, and the court finds Jones's claims are unexhausted. However, even if the claims were exhausted, defendants are entitled to dismissal of the claims against them or for summary judgment in their favor for reasons to follow.

### 3.  Sexual Abuse Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "[S]exual or other assaults are not a legitimate part of a prisoner's punishment, and the substantial physical and emotional harm suffered by a victim of such abuse are compensable injuries" under the Eighth Amendment. *See Woodford v. Ngo,* 548 U.S. 81, 118 (2006) (Breyer, J., dissenting) ("Accordingly, those inmates who are sexually assaulted by guards, or whose sexual assaults by other inmates are facilitated by guards, have suffered grave deprivations of their Eighth Amendment rights."); *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their

offenses against society.") (internal citation omitted); *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998).

Jones claims that she was sexually molested and raped by Rounds, Jr., and "other" correctional officers.  (Compl. ¶ 16.)  Jones alleges that on Wednesday, September 30, 2015, Rounds, Jr., took her to an area without surveillance cameras where he molested her, forced her to engage in oral sex, and raped her. (*Id*.)  Defendants have provided unrefuted evidence that Rounds, Jr., was not at work on that date. (Decl. of John White ¶ 6.)

Further, prior to filing this case, Jones did not raise any allegations of sexual assault against Rounds, Jr., although the opportunity to do so had been presented.  For example, on October 6, 2015, just five days after the alleged rape by Rounds, Jr., IID Investigator Peterson interviewed Jones concerning her allegations of sexual assault by inmates Riddle, "Loon," and Joyce. (Decl. of Nicole Beuchert 11.)  Jones did not indicate she had been assaulted by a correctional officer.  (*Id*. at pp. 10–16.)  On November 9, 2015, when Jones met with social worker Monica Wilson for PREA counseling, she did not raise any rape claims of sexual abuse by Rounds, Jr., or any correctional officer. (Michael Jones Med. R. 7, 71.)  Further, Jones refused to be interviewed as part of the IID investigation of the alleged rape.  (Decl. of Britt Brengle 7.)

After reviewing the institutional reports and interviewing Rounds, Jr., and Monica Wilson, IID investigator Burton determined the claims were unfounded and recommended closing the case.  (*Id.*)  When asked by Dr. Ashraf on December 7, 2015, whether she had questions concerning sexual or physical abuse that occurred in October 2015, Jones stated she had no complaints about sexual or physical abuse.  (*Id*. at pp. 6, 19, 73.)  Similarly, when Jones was examined by Dr. Graves on December 8, 2015, she did not raise concerns of rape, but

indicated the matter had already been addressed.   (Michael Jones Med. R. 21.)   Rounds, Jr.,

denies having any physical contact or sexually assaulting Jones. He further denies knowledge of

an incident in which officers sexually assaulted Jones.  (Decl. of Britt Brengle 7, Decl. of Dean

Rounds, Jr., ¶ 3.)  Defendants attest that at no time did they or any other officer in their presence

sexually or physically assault Jones. (Decl. of Charles Bielanski ¶ 3; Decl. of Cody Gilpin ¶ 3;

Decl. of Janet Puffenbarger ¶ 3; Decl. of Jamey Durst ¶ 3; Decl. of Dean Rounds, Sr., ¶ 3; Decl.

of Dean Rounds, Jr., ¶ 3; Decl. of Timothy Marchinke ¶ 3; Decl. of Bradley Wilt ¶ 12.)

If the parties offer differing versions of events in affidavits or pleadings sworn under

penalty of perjury, and the differences involve genuine issues of material fact, summary

judgment is precluded.  Credibility generally cannot be judged on the pleadings, though if a party

alleges facts that are blatantly contradicted by the record, the court should not rely on the party's

factual allegations in ruling on summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (1970).

Where, as here, the parties "tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that version of the

facts for the purposes of ruling on a motion for summary judgment." *Smith v. Ozmint,* 578 F.3d

246, 254 (4th Cir. 2009) (quoting *Scott,* 550 U.S. at 389). Jones's allegations are clearly and

consistently refuted by defendants' unopposed testamentary and verified evidence.

To the extent that Jones seeks to impose liability on defendants under the PREA, she fails

to state a basis for a cognizable claim. There is no basis in law for a private cause of action under

§ 1983 to enforce a PREA violation. "[S]ection 1983 itself creates no rights; rather it provides a

method for vindicating federal rights elsewhere conferred." *Doe v. Broderick*, 225 F.3d 440, 447

(4th Cir. 2000) (internal citations omitted). "[W]here the text and structure of a statute provide

no indication that Congress intends to create new individual rights, there is no basis for a private

suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act. *See Williams v. Dovey,* No. DKC-15-1891, 2016 WL 810707, at \*7 (D. Md. March 2, 2016) (citing *Ball v. Beckworth,* No. CV 11–00037, 2011 WL 4375806, at \*4 (D. Mont. Aug. 31, 2011) (citing cases)). Accordingly, defendants are entitled to summary judgment as to the claim of sexual assault.

### 4.  Failure to Protect

In order to prevail on an Eighth Amendment claim of failure to protect from violence, a plaintiff must establish that defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).

> Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency. . . . [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837 (internal citations omitted); *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (*citing Farmer,* 511 U.S. at 832).   Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks omitted). "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison

officials responsible for the victims safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk to either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).   The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).   A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment.   *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn.   *Id*. at 837.   A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128.

Jones claims that on Wednesday, September 30, 2015, Puffenbarger and Bielanski watched as Rounds, Jr., and "other" correctional officers sexually assaulted her.  (Compl. ¶ 16.) Contrary to Jones's claims, however, Rounds, Jr., was not at work that day, as it was his regular day off.  (Decl. of John White ¶ 6.)  If Rounds, Jr., was not at work, then it follows Puffenbarger

and Bielanski did not witness an assault perpetrated by Rounds, Jr., on Jones that day in a prison

hallway.   As noted, Puffenbarger and Bielanski, as well as all other defendants, have executed

declarations stating they did not sexually assault Jones or witness a sexual assault on Jones

perpetrated by other correctional officers.   (*See, e.g.*, Decl. of Charles Bielanski ¶ 3; Decl. of

Janet Puffenbarger ¶ 3.)   Jones fails to dispute those declarations, thus defendants are entitled to

summary judgment as to this claim.

### 5.  Conditions of Confinement

An inmate may state an Eighth Amendment claim based on the conditions of his

confinement. Indeed, the Eighth Amendment "imposes duties on [prison] officials, who must

provide humane conditions of confinement." *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir.

2015) (*citing Farmer*, 511 U.S. at 832). Conditions that "deprive inmates of the minimal

civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v.

Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even

harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

To establish a claim for cruel and unusual punishment due to conditions of confinement,

a plaintiff must show (1) an objectively serious deprivation of a basic human need causing

serious physical or emotional injury, and (2) that prison officials were deliberately indifferent to

that need. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

A plaintiff cannot have been found to be subjected to unconstitutional confinement

conditions unless he can show a serious or significant physical or mental injury as a result of

those conditions. *Strickler v. Waters*, 989 F.2d 1375, 1379–81 (4th Cir. 1993). Therefore, "to

withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff

must produce evidence of a serious or significant physical or emotional injury resulting from the

challenged conditions." *Id.* at 1381; *see Odom v. S.C. Dep't of Corr.,* 349 F. 3d 765, 770 (4th Cir.

2003). To satisfy the second requirement, a plaintiff must allege facts sufficient to show that the

defendant knew of circumstances from which an inference could be drawn that a "substantial risk

of serious harm" was posed to plaintiff's health and safety, that he drew that inference, and that

he disregarded the risk posed. *Farmer*, 511 U.S. at 837; *Wilson*, 501 U.S. at 298.

Of import here, mere negligence is insufficient to support an Eighth Amendment claim.

*Farmer*, 511 U.S. at 835 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An official's

"failure to alleviate a significant risk, that he should have perceived but did not, while no cause

for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. "The

Eighth Amendment deliberate-indifference standard requires a far more culpable mental state

than mere negligence; the defendant must recklessly disregard an excessive risk of which he is

subjectively aware." *Gardner v. United States*, 184 F. Supp. 3d 175, 183 n.14 (D. Md. 2014).

Jones alleges that on September 28, 2015, she was placed in a cold cell with only a

suicide smock.  (Compl. ¶ 15.) She claims she was denied blankets, sheets, toilet paper, and her

personal property.  (*Id.*)  She faults Puffenbarger, Bielanski, Rounds, Sr. Gilpin, and Marchinke

for denying her blankets, sheets, and property and making her sleep on a cold floor.  (*Id.*)   Jones

was placed in a security garment and put in a holding cell for observation and mental health

providers were notified, after she threatened to commit suicide. (Info. R. Form.) Jones was seen

for suicide follow-up by a member of the mental health staff.  (Michael Jones Med. R. 4, 7, 9.)

Jones does not allege that she suffered physical or psychological harm as a result of the alleged

conditions.   Even viewing these facts in the light most favorable to Jones, it is clear that

defendants acted to protect Jones from self-harm, and, most importantly, Jones does not allege

that she suffered physical or emotional injury as a result of the incident.

Jones claims that on October 27, 2015, she was left in cell #30 for six days without a mattress and toilet paper, and with only a suicide smock to wear.  (Suppl. Compl. ¶¶ 19–20.) Jones had covered her cell window and used screws to scratch and deface the cell window. (Inmate Hearing R. 9.)  She was later returned to the cell wearing only a security garment, not because she was on suicide watch but to prevent her from covering the window with the jumpsuit. (Michael Jones Med. R. 17.)  Absent from Jones's claims is any allegation or objective evidence of a serious or significant physical or emotional injury resulting from her six day confinement.

The court has reviewed the unopposed exhibits provided by defendants and finds that Jones has failed to demonstrate that the conditions to which she was exposed caused injury directly related to those conditions. Thus, even when the facts are viewed in the light most favorable to Jones, there is no genuine issue of material fact in dispute and defendants are entitled to summary judgment in their favor as a matter of law.

### 6.  Use of Force

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Hudson*, 503 U.S. at 7–9. Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain

or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6–7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321. The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

Jones's claims of excessive force are premised on three separate incidents. First, she claims that on October 12, 2015, Marchinke and Rounds, Jr., tried to break her wrists as they were removing her handcuffs. (Suppl. Compl. at ¶ 3.) Second, she claims that on October 20, 2015, Rounds, Jr., Marchinke, and Fann walked her back to her cell and tried to break her wrists. (*Id*. at ¶ 5.) Jones also alleges that on October 27, 2015, defendants Durst and "John Doe" kicked her legs and pulled her handcuffs in an attempt to break her wrists. (*Id*. at ¶ 7.)

Defendants provide uncontroverted records which establish that from October 8, 2015, to October 14, 2015, Jones was away from NBCI on a medical trip. (Record of Segregation

Confinement 8, 10, 12.)  Her absence from NBCI on October 12, 2015, disproves her allegation

that Marchinke and Rounds used force against her on that date.

Regarding the alleged October 20, 2015, incident, Marchinke, who allegedly participated

in the incident, was not at work that day. (Decl. of John White ¶ 8.) Defendants attest they did

not physically harass or threaten Jones.  (Decl. of Dean Rounds, Jr., ¶ 3; Decl. of Timothy

Marchinke ¶ 3.)  On October 21, 2015, Vincent Siracusano met with Jones for a psychiatric

follow up visit. (Michael Jones Med. R. 12.)  Jones did not report the incident which allegedly

had occurred on the previous day, nor were any physical or psychological injuries noted

consistent with a recent use of force. (*Id.*)

On October 27, 2015, officers were authorized to use force after Jones refused an order to

remove the covering from her cell window.  (Inmate Hearing R. 9.)  Use of force was avoided,

however, because Jones eventually complied after successful negotiation with correctional and

mental health staff.  (*Id.*)  The incident was peacefully resolved, and Jones was escorted to the

Boss chair and back to her cell without incident. (*Id.*)  The video footage of the incident

supported defendants' version of the events and contradicts Jones's use of force claim. (DVD of

Michael Jones Escort.)

A plaintiff's self-serving affidavit is not sufficient to withstand summary judgment.  *See*

*e.g. National Enterprises, Inc. v. Barnes*, 201 F3d 331, 335 (4th Cir. 2000).  Jones's allegations

of excessive force are refuted by the defendants' declarations and uncontroverted video footage

capturing the incident.  Although the court cannot resolve conflicting affidavits on summary

judgment, Jones's contention is at odds with the video footage.  *See Witt v. West Virginia State*

*Police, Troop 2,* 633 F.3d 272, 276 (4th Cir. 2011) (stating that "when a video 'quite clearly

contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury would

believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott*, 550 U.S. at 378)).   In addition to the video footage, Jones's allegations are refuted by the record showing that she was not at NBCI on the day of the incident, and Marchinke was not at work on the day he is alleged to have assaulted Jones. The allegations are also refuted by the absence of medical corroboration and the defendants' undisputed declarations under oath.   Consequently, the defendants are entitled to summary judgment as to this claim.

### 7.   Medical Treatment

Jones alleges in her affidavit that on October 27, 2015, defendants kicked her legs and pulled her handcuffs to try to break her wrists when they escorted her to her cell.  (Suppl. Compl. ¶ 7.) Jones asked for medical treatment and was denied.  (*Id*. at ¶ 8.) Jones's allegations of an assault and injury are directly refuted by the video footage of the escort. (DVD of Michael Jones Escort.)  Defendants deny refusing Jones medical treatment.  (Decl. of Charles Bielanski ¶ 4 Decl. of Cody Gilpin ¶ 4; Decl. of Janet Puffenbarger ¶ 4; Decl. of Jamey Durst ¶ 4; Decl. of Dean Rounds, Sr., ¶ 4; Decl. of Dean Rounds, Jr., ¶ 4; Decl. of Timothy Marchinke ¶ 4.) For reasons earlier discussed, defendants are entitled to summary judgment as to this claim.

### 8.   Verbal Abuse

Verbal abuse of inmates by guards, without more, states no claim of assault. See *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219 n. 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).  A threat of harm, however, combined with action apparently designed to carry out a threat, may state an Eighth Amendment claim. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). Jones's allegations of racial slurs and threats by guards do not support a constitutional claim.  No matter

how reprehensible the alleged conduct, such conduct is not violative of rights secured under the Constitution or laws of the United States.  Accordingly, this claim will be dismissed.

### 9.  Discrimination and Gender Harassment

Jones avers Rounds, Sr., Gilpin, and Marchinke "racially and genderly [sic] discriminated against her." (Compl. ¶ 21.)  As Jones sets forth no averments of fact to support this threadbare statement, it must be dismissed.

## CONCLUSION

For the reasons stated in this memorandum, the court shall grant defendants' motion to dismiss or, in the alternative, motion for summary judgment, by separate order to follow.

_____March 15, 2017_____                     _____/S/_____
Date                                                         Catherine C. Blake
                                                                United States District Judge